UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                         Case No. 3:23-cr-575-5

        Plaintiff,

  v.                                          MEMORANDUM OPINION
                                            AND ORDER

Kishan Vinayak Patel,

        Defendant.

## I.    INTRODUCTION

Following a week-long trial, a jury convicted Defendant Kishan Vinayak Patel of three offenses: conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 1); concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count 5); and promotion money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (2) (Count 9). (Doc. No. 170; *see* Doc. No. 77 at 1, 8, 9, 10). After the close of the evidence, but before the jury's verdicts, I denied Patel's oral motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29. (*See* non-document entry dated January 31, 2025). Patel has renewed his Rule 29 motion and has also moved, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33. (Doc. No. 206). The government filed a brief in opposition. (Doc. No. 229). Patel filed a brief in reply. (Doc. No. 256). For the reasons that follow, I deny Patel's motions.

## II.    BACKGROUND

Patel and seven others were indicted for their participation in a type of money laundering fraud scheme known as a "phantom hacker scam," in which a group of defrauders exploit

individuals' concern for the security of their online accounts to steal large sums of money. (*See* Doc. No. 77). In this kind of fraud conspiracy, a scheme participant initiates contact with a potential victim by posing as a customer service representative for a consumer-facing company or bank. After convincing the victim their account has been compromised, the first defrauder refers the victim to a second party posing as a law enforcement officer, who then persuades the victim to transfer large sums of money to a third-party under the guise of keeping the funds safe. In reality, the money is stolen and distributed to the members of the fraud scheme.

The criminal operation here ran in a similar fashion. After initiating contact, a scheme participant convinced each victim over the phone that the only way to safeguard their money was to transfer it to a third party. The personas adopted by the front-end fraud scheme participants varied: in one instance, for example, a victim was convinced he was working with a DEA agent; in another, a fraud scheme participant persuaded a victim she was working with a member of the Federal Trade Commission. In all cases, the front-end fraud scheme participants deceived and manipulated their victims over the course of days or weeks until they agreed to part with their money—often tens or hundreds of thousands of dollars in total, sometimes in multiple "batches." Unusually for a scheme of this kind, however, the transfer of funds took place in person, with cash and gold bars, rather than virtually.

Patel was not one of the front-end operators who manipulated and threatened the targets of the scam. Neither did he manage or coordinate the fraud scheme at a higher level. Instead, he personally received and transported the proceeds of the scheme from two of the victims.

Patel resided in Canada just on the other side of the Michigan border, in Windsor, Ontario. He liked to gamble on sports betting apps, and he wanted to buy a house. (*See* Doc. No. 254 at 40-42; Doc. No. 251 at 26). But Patel was unlucky. On August 30, 2023, communicating with a contact named "Scott," Patel admitted, "I am in loss, so [I] don't have much money . . . [l]et's say

2

you first w[i]n me some money, then I can pay you. . . . [Y]ou need to trust, I'll give you money . . . once I make money, I can pay you[.]" (Doc. No. 254 at 46). Ten days later, Patel was more urgent: "I need to make 30k in two months. Tell me proper way to do it. I can have 10k bankroll at max. No more. Every 5k I make, I will give you 1k. Let me know what you think." (*Id.*). He continued: "I am in very bad condition financially. I mean, not that bad, but there are expenses coming up in November which I need to be ready to pay." (*Id.* at 47).

Patel continued his unsuccessful gambling activities in October. (*See id.* at 41-42). Around that time, he sent a message to a contact he called "Riyaz Bhai" containing his phone number, his postal code, the zip code nearest to him in the United States, and a list of states to which he was willing to travel: Michigan, Indiana, Ohio, and Illinois. (*See id.* at 44). Soon thereafter, he communicated with someone named "Aditya." (*See id.* at 43). Patel and "Aditya" discussed gambling—a mutual interest—and "Aditya" inquired if Patel had spoken "to him." (*Id.* at 43, 45). Patel said this third-party would "let us know if something comes." (*Id.*). "Aditya" asked if Patel "underst[ood] what the process is," and Patel replied, "no" and sent "Aditya" a screenshot of his prior communication with "Riyaz Bhai." (*Id.* at 44). "Aditya" then called Patel. (*See id.*).

After this, Patel began to communicate with another person named "Owen" to arrange pickups of funds. (*See id.* at 45, 50). "Owen" and Patel communicated about several possible pickups—though Patel only completed two. (*See* Doc. No. 255 at 111-12).

Patel completed his first pickup on November 3, 2023. (*See* Doc. No. 254 at 50). The process began with a text from "Owen" that morning: "46897 cash pick up." (*Id.*). 46897 is the zip code covering Fort Wayne, Indiana. "Owen" texted Patel, "send map" and then called him. (*Id.*). "Send map" indicated Patel should type the zip code into a mapping application on his phone (such as Google Maps or Apple Maps), take a screenshot of the route, and send it back to show how far he was from the location "Owen" had sent him. (*See id.* at 49). Patel did so. (*Id.* at 51). "Owen"

3

responded, "leave when I tell you." (*Id.*). At 11:51am on November 3, "Owen" sent the Fort Wayne home address for one of the scheme's victims. (*See id.*). Twenty-eight minutes later, Patel entered the United States by car and began to drive to the Fort Wayne area. (*See id.* at 51-52). While he drove, "Owen" monitored him closely, texting and calling him several times with requests for updates on his progress. (*See id.* at 52-54).

As Patel got closer, "Owen" sent him the address for a Sportsman's Warehouse, where the pickup was to take place. (*Id.* at 54). When Patel arrived, "Owen" sent him a visual description that matched the clothing and car of Diane Robinson, the victim from which he was to receive the funds. (*Id.*). Patel responded with a description of his clothing and the car he was driving. (*Id.* at 54-55).

This was Robinson's second "delivery." The first time, a defrauder masquerading as then-FTC Commissioner Alvaro Bedoya manipulated Robinson into giving up $40,500, the sum total of the inheritance she had recently received after her parents' passing. (*See* Doc. No. 247 at 14-15). The first transaction took place in a gas station parking lot, and Robinson was instructed to place a box of cash in the back of an SUV, a different car than the one Patel drove. (*See* Doc. No. 247 at 13-15). Similarly, for the transaction involving Patel, Robinson arrived at the Sportsman's Warehouse on November 3, 2023, with $67,000 in cash in a box, money she had taken out of her IRA account at the behest of the same defrauder. (*See id.* at 7, 17). Patel pulled up beside Robinson, and Robinson put the box with her money in the backseat of Patel's car, as she was instructed. (*See id.* at 20).

Patel sent "Owen" a video of the box, and "Owen" responded: "Do not open it. Go somewhere about 20 to 25 minutes away. . . . Then call me and I will explain." (Doc. No. 254 at 55-56). Patel called "Owen." (*Id.* at 56). Some minutes later, Patel sent "Owen" a nearly ten-minute-long video in which he counts every single bill of cash in the box, taking notes on his phone all the

4

while.  (*See id.* at 57).  Patel also sent "Owen" a photo of the notes he took to corroborate the counting.  (*See id.* at 58).

"Owen" then sent Patel information to coordinate the drop-off of the funds.  First, he sent the zip code 60016—near Chicago.  (*See id.* at 59).  Patel began driving.  Then, "Owen" forwarded a message with the word "Chicago," the serial number of a dollar bill, and the name "David."  (*Id.* at 59-60).  The dollar bill serial number is part of a verification technique used by this particular fraud scheme: the individual receiving dropped-off funds gives a dollar bill with a particular identification number or serial number to the courier who has the funds, and the courier checks to make sure the number on the bill they are given matches the one they were told to expect.  (*See id.* at 60-61, 63).

Patel received an Illinois address, and then "Owen" told him his cut: $1,300.  (*See id.* at 60-61).  Patel asked for confirmation of the address, and "Owen" gave him "David's" number to call.  (*See id.* at 61).  Patel called the number and began communicating with "David," and "David" provided a different address in Schaumburg, Illinois.  (*Id.* at 62).  Some time later, Patel sent a screenshot of a map with his location, which by then was near Gary, Indiana.  (*Id.*).  By 8:14pm central time, Patel had completed the drop-off.  (*See id.* at 63-64).  He crossed the border back into Canada at 2:32am on November 4, 2023.  (*Id.* at 64).  A few minutes later, he texted "Owen" confirmation of the drop-off.  (*Id.* at 65).

Despite the late hour, Patel couldn't sleep.  He began messaging "Aditya" again, complaining that a Monster Energy drink was keeping him up.  (*Id.* at 65).  "Aditya" responded: "You cannot sleep perhaps because you are happy about the money."  (*Id.*).  Patel demurred, and "Aditya" continued: "I ha[ve] spoken with brother.  He told me since it is new, [you] will have to work hard and travel longer distances too. . . . [h]e will explain it all to you tomorrow."  (*Id.* at 66).

The next day, "Owen" sent Patel an address in Michigan.  (*See id.*).  Patel expressed interest: he sent a screenshot of a map showing his distance to the location, and the next day he asked

5

"Owen" if there would be "[a]ny delivery today." (*Id.* at 67). Patel did not make that particular "delivery." (*See id.*). But a few days later, on November 9, 2023, "Owen" contacted him again with an address in Indiana connected to another victim of the scheme, Donald Evans. (*See id.* at 67).

Like Robinson, Evans had already been manipulated into delivering funds to the defrauders before his interaction with Patel: a total of $285,000 over the course of five separate "drops." (*See* Doc. No. 246 at 9-11, 12-14, 17-18, 19-20, 22-23). Fortunately for Evans, the FBI intercepted the courier attempting to transport the fifth drop, consisting of $100,000 in cash and gold bars. (*See id.* at 23-25). With the cooperation of Evans, who was still in contact with his defrauder, the FBI planned a controlled delivery for November 9—unbeknownst to Patel. (*See id.* at 25-26).

"Owen" asked Patel to "send map," and after speaking with "Owen" over the phone, Patel did so. (*See id.* at 68). "Owen" asked for Patel's zip code and said he would tell Patel when to leave. (*See id.*). "Owen" sent Patel information for a gas station in Liberty Center, Ohio and told him to "go there quickly." (*Id.* at 68-69). Twenty minutes later, at 11:35 am on November 9, Patel crossed the Canada border and entered the United States. (*See id.*).

Just as before, "Owen" demanded periodic updates during Patel's journey. (*See id.* at 70). When Patel got close to the gas station, "Owen" forwarded an image of Evans' license plate and vehicle, and Patel responded with his own vehicle information. (*See id.*). After Patel arrived, Evans approached his vehicle and dropped a yellow bag containing $40,000 in cash into the back seat through an open window. (*See* Doc. No. 246 at 29-31). Patel drove away, but after driving for a few minutes, he turned off onto a secluded dirt road and stopped. (*See* Doc. No. 249 at 40-41). There, he counted the money in the bag. (*See id.* at 43-44). Like with the Robinson pickup, Patel sent "Owen" videos documenting his counting of the cash. (*See* Doc. No. 254 at 72-73). "Owen" then instructed Patel to "[g]o to Chicago." (*Id.* at 73). Just as before, "Owen" called Patel and forwarded

6

a message with the word "Chicago," the serial number of a dollar bill, the name "David," and "David's" phone number. (*See id.* at 73-74).

Patel did not make it to Chicago to meet "David" a second time. Surveilled by the FBI and Indiana State Police throughout the entire transaction with Evans, Patel was eventually pulled over. (*See* Doc. No. 249 at 35-36, 49-50). During the traffic stop, Patel was questioned by FBI Special Agent Jonathan Joyce. (*See* Doc. No. 251 at 13).

When asked about the purpose of his journey, Patel initially said he was going to visit a friend, Jay Patel, in Chicago. (*See id.*). Despite the aerial surveillance footage showing Patel receiving the bag containing the funds from Evans that same day, Patel told Joyce he did not know when he received the yellow bag. (*Id.* at 15). Patel also told Joyce he had picked up the yellow package near a Domino's in downtown Detroit. (*See id.* at 18). And despite the video Patel had just taken of himself counting the money in the bag Evans had given him, Patel initially denied knowing what was in the bag. (*See id.* at 15, 17).

After a few minutes of questioning, Patel's answers began to change. By then, much of their conversation had moved off-camera and was not recorded. (*See id.* at 23-24). Patel admitted to Joyce he was directed to pick up the package by an individual named "Owen." (*See id.* at 20-21). Joyce asked questions about "Owen" and the directions Patel was receiving, and the two went through videos and texts on Patel's phone. (*See id.* at 24). Patel told Joyce he had done another pickup approximately a week prior. (*See id.*).

He disclosed he was "surprised" it took so long for law enforcement to investigate, because he had known about the pickups for over a year, even though he hadn't decided to start doing the cash pickups until the previous week. (*See id.* at 24-25). Patel stated he got paid for the pickups and that while he didn't know how much he would be paid for the current pickup, he had received $1,300 for the previous one. (*See id.* at 25). After watching the video of him counting the money on

7

his phone, Patel admitted that he knew there was cash in the yellow bag, and he also admitted to Joyce he was going to Chicago to drop off the package with "David." (*See id.*).

When asked why he started picking up the cash, Patel said he needed the money because of his gambling activities. (*Id.* at 26). He also said he wanted to buy a house and needed money for a down payment. (*Id.*). In addition, Patel said he was initially concerned that the pickups might be drug money, but that his fears had been allayed somewhat when he realized the money looked like it came "directly from the bank." (*Id.* at 27).

Six of Patel's co-defendants pled guilty to various money laundering offenses. Patel and one other defendant, Pranay Kumar Mamidi, went to trial. After the close of the government's evidence, Patel moved for a judgment of acquittal under Rule 29. (Doc. No. 222 at 6-8). I reserved decision on the motion. (*See id.* at 11). Patel renewed his motion after the close of all the evidence, and I denied it on the record at that time. (Doc. No. 223 at 3-4). After the jury found Patel guilty on all three counts, this briefing followed. (*See* Doc. Nos. 206, 229 & 256).

### III.    STANDARD

Rule 29 provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "If the court reserves decision [on the motion], it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). Rule 29 permits a court to set aside a jury's guilty verdict and enter an acquittal. Fed. R. Crim. P. 29(c)(2). A court considering a Rule 29 motion, "while reviewing the record in the light most favorable to the prosecution, should grant relief only if it is found that upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *United States v. Abner*, 35 F.3d 251, 253 (6th Cir. 1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).

8

Rule 33 permits a defendant to move a court to vacate a judgment and "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A Rule 33 motion "calls on the trial judge to take on the role of a thirteenth juror, weighing evidence[,] and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018). Such motions are "discretionary," and "[a] trial court should only grant the motion when the verdict is against the 'manifest weight' of the evidence." *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019) (quoting *Mallory*, 902 F.3d at 596) (additional citation omitted).

### IV. ANALYSIS

**A. RULE 29 MOTION**

Patel contends the government did not present enough evidence for a rational juror to find, beyond a reasonable doubt, the *mens rea* elements of each offense for which he was convicted. (*See* Doc. No. 206 at 3-5).

**1. 18 U.S.C. § 1956(h) – Money Laundering Conspiracy**

Section 1956(h) requires proof "(1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Matthews*, 31 F.4th 436, 447 (6th Cir. 2022) (quoting *United States v. Powell*, 847 F.3d 760, 781 (6th Cir. 2017)) (quotation marks omitted). To establish Patel had the requisite mental state, the government needed to prove, beyond a reasonable doubt, that Patel "knew the property involved was proceeds of unlawful activity;" and . . . either 'intended to promote that unlawful activity' or '[knew] that the transaction is designed in whole or in part to disguise the . . . source, ownership or control of the proceeds.'" *Matthews*, 31 F.4th at 447 (quoting *United States v. Warshak*, 631 F.3d 266, 317, 320 (6th Cir. 2010)) (quotations omitted in *Matthews*).

Patel does not contest the existence of the money laundering conspiracy in this case. (*See* Doc. No. 222 at 8; Doc. No. 206 at 3). Instead, he argues, "the evidence admitted at trial failed to

9

prove . . . that Mr. Patel knew of the conspiracy and its goals and that he joined the conspiracy intending for at least one member of the conspiracy to commit money laundering" because the government's case "focused on physical acts" and "fail[ed] to establish the requisite mental state." (Doc. No. 206 at 3).  More specifically, he contends he did not think what he was doing contributed to a money laundering conspiracy because he did not try to hide the fact that his car came from Canada, and because he stared at Diane Robinson during their encounter.  (*See* Doc. No. 206 at 3-4; Doc. No. 256 at 2-4).  Patel also points out that his messages with "Aditya" and others don't expressly mention money laundering, a conspiracy, or victims of fraud.  (*See* Doc. No. 256 at 4).

But the government need not "produce a smoking gun" in order for a jury to convict. *Matthews*, 31 F.4th at 448.  Instead, "'[a] conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *Matthews*, 31 F.4th at 448 (quoting *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)) (additional quotation marks omitted in, and alteration by, *Matthews*).  Viewing the evidence presented at trial in the light most favorable to the government, I conclude a rational juror could find Patel knew of the conspiracy and joined it intending for at least one member of the conspiracy to commit money laundering.  (*See* Doc. No. 172 at 17-20).

Patel's communications before his pickups help set the stage.  He needed money for various expenses due in November of 2023, possibly totaling as much as $30,000.  So, he got in touch with "Riyaz Bhai," and he sent information about his location and driving availability.  When Patel was uncertain about the "process," his contact "Aditya" called him to explain.  A rational juror could conclude this is a suspicious series of events, to start.  Patel needed to make a large amount of money very quickly, and his contact did not feel comfortable explaining over text the process by which Patel might do so.

Patel's communications with "Owen" likewise support the conclusion he knowingly participated in a conspiracy to engage in unlawful activity. Patel was told his first journey would be for a "cash pickup" in the Fort Wayne, Indiana area, and he was instructed to leave immediately at "Owen's" whim. "Owen" monitored Patel's progress throughout his hours-long drive, and he was only given the information necessary to complete the pickup as he got close. Then, in a wordless transaction, a woman Patel knew only from "Owen's" description of her appearance placed a bag of cash in the backseat of his car. Patel was instructed to drive 20-25 minutes away before counting every dollar in the bag—again, a process explained over the phone rather than by text. He was further instructed to send a video to "Owen" of this laborious process.

Several aspects of this transaction supports the conclusion Patel knew he was playing a role in a criminal conspiracy: driving for hours at a moment's notice to pick up cash, the anonymous nature of the pickup, the constant monitoring by an interlocutor identified only by a first name, the sparse information given only as necessary, the command to drive to a second location out of public view, and the requirement to count the money immediately and to verify it with a video. Hiding identities, counting money in secret, and strictly limiting the flow of information are hallmarks of coordinated unlawful activity. *See United States v. Mosley*, 53 F.4th 947, 959 (6th Cir. 2022) ("Conspiracies . . . often work best in secret); *United States v. Browning*, 40 F. App'x. 873, 877 (6th Cir. 2002) (evidence the defendant attempted to hide information about the identities of the coconspirators and created shell companies to obscure the movement of funds supported her conviction for conspiracy to commit money laundering).

When taken together, a rational juror could conclude these circumstances show Patel was aware he was involved in a criminal conspiracy. A rational juror could also conclude Patel's acquiescence to "Owen's" request to hide his counting of the cash shows Patel intended for at least one member of the conspiracy to commit a money laundering offense.

The circumstances surrounding the delivery likewise support the conclusion Patel knew about the conspiracy and joined it intending for another member of the conspiracy to commit a money laundering act. The complicated verification system Patel used to confirm the delivery did not involve any conventional identifying details, such as "David's" full name or appearance. Patel completed the delivery as instructed—again while monitored by "Owen"—and took a cut of the cash as payment for his work. In short, Patel was paid to personally deliver the proceeds of the scheme to one conspiracy member at the direction of another conspiracy member. This also supports the conclusion Patel knew about the conspiracy and participated in it with the intent that at least one other member of the conspiracy, including himself, engage in money laundering. *See United States v. Agundiz-Montes*, 679 F. App'x. 380, 388 (6th Cir. 2017) (affirming a conviction for conspiracy to commit money laundering where the defendant "personally paid" rent on a warehouse using the proceeds of a drug conspiracy and accompanied a co-conspirator to make deposits of drug money at a bank).

Moreover, after conducting this initial pickup-and-delivery, Patel immediately sought out opportunities to do it again. The second delivery followed the same secretive process as before. "[T]he jury could reasonably infer the requisite animating purpose and knowledge" from Patel's repeated participation in these "irregular monetary transactions." *United States v. Donohue*, 726 F. App'x. 333, 352 (6th Cir. 2018); *see also United States v. Miller*, 562 F. App'x. 272, 297 (6th Cir. 2014) (defendant's receipt of a wire transfer for less than $1,000, combined with testimony such transfers were often used by drug dealers to evade detection, supported the jury's verdict).

Finally, Patel's comments to Joyce after the Evans pickup are probative of his knowledge of the scheme and his intent to further it. A rational juror could conclude Patel initially chose to lie about whether he knew what was in the bag, where he received the bag, and who he planned to meet in Chicago because he knew he was transporting and delivering the proceeds of a criminal

12

conspiracy. Patel's expression of "surprise" that law enforcement hadn't investigated the scheme earlier, combined with his admission he thought the money might initially have been connected to drug trafficking, further strengthens this inference. *Cf. United States v. Cole*, 59 F. App'x. 696, 699 (6th Cir. 2003) (holding that the defendant's statement, "Tell me a young black man going to sit here and tell you how he's selling dope? I can't do it" was "ambiguous and it was properly admissible for the jury to draw its own inferences").

In sum, the government presented evidence of Patel's overt participation in a scheme bearing all the hallmarks of a criminal conspiracy. Patel's statements and admissions to Joyce during his interview further bolster the strength of this circumstantial evidence. A rational juror could conclude from this evidence, taken as a whole and viewed in the light most favorable to the government, that Patel knew the cash he picked up was the proceeds of unlawful activity, and that he intended to promote the conspiracy or knew that his transactions were designed to disguise the proceeds. For these reasons, I conclude the government presented sufficient evidence to convict Patel of conspiracy to commit money laundering under 18 U.S.C. § 1956(h). I deny Patel's Rule 29 motion as to Count 1.

**2.      18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering**

To prove a violation of § 1956(a)(1)(B)(i), the government needed to show, beyond a reasonable doubt, that Patel "conducted a financial transaction with the purpose (in whole or in part) of concealing the nature, location, source, ownership, or control of the illegal funds used in the transaction." *United States v. Patel*, 651 F. App'x 468, 472-73 (6th Cir. 2016) (citing 18 U.S.C. § 1956(a)(1)(B)(i)). Concealment must have been "an animating purpose of the transaction," though it need not have been the sole or primary purpose. *United States v. Faulkenberry*, 614 F.3d 573, 586 (6th Cir. 2010). "[T]he defendant's conduct may support an inference" of the required intent to conceal. *Patel*, 651 F. App'x at 473 (citing *United States v. Warshak*, 631 F.3d 266, 321 (6th Cir. 2010)).

13

Patel argues the government did not meet its burden because "[h]e made no attempt to hide his identity" during the pickups, and he "drove a car with Canadian plates to the pickup[s]," which he asserts is inconsistent with an "inten[t] to play an American law enforcement agent." (Doc. No. 256 at 3).

But this argument ignores important evidence and misconstrues the government's theory of the case. At trial, the government did not attempt to prove Patel tried to pass himself off as a law enforcement officer. Instead, the evidence of concealment focused on Patel's secretive behavior leading up to and, especially, after he made the pickups. Both times, he waited to verify the amount of the pickup, as instructed by "Owen," until he had driven to a more isolated second location. And while Patel did not conceal his face from Robinson or modify the license plate on his car, "'evidence need not remove every reasonable hypothesis except that of guilt'" in order to sustain a verdict. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984)) (emphasis in *Stone* removed). Patel did not tell Evans or Robinson his name, and he wordlessly accepted large quantities of cash into the backseat of his car during transactions that took place in mere minutes. Given the brief and impersonal nature of the transactions, a rational juror could infer that Patel did not feel he needed to take any further actions to conceal his identity.

Taken together, Patel's behavior is enough to show his intent to conceal, from the victims of the scheme and any other observers, the "nature . . . of the proceeds" and who "own[ed]" and "control[led] . . . the proceeds." 18 U.S.C. § 1956(a)(1)(B)(i). Patel never identified himself to Evans or Robinson; he never spoke to them at all. A rational juror could conclude from this, and from Patel's dissembling statements to Joyce, that one of Patel's purposes in conducting the pickups this way was to hide the true nature of the pickups. A rational juror could also conclude that "Owen's" instructions for painstakingly counting and verifying the funds on video would have raised

14

suspicions about whom the transactions benefited, if Patel had been observed, and that Patel moved to a different location to better conceal this unusual behavior. In all, therefore, a rational juror could have concluded Patel knew he engaged in a transaction with proceeds from an unlawful source, and that Patel intended to conceal an "attribute of the funds" listed in § 1956(a)(1)(B)(i). *Faulkenberry*, 614 F.3d at 586.

For these reasons, I conclude the government presented sufficient evidence to convict Patel of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i). I deny Patel's Rule 29 motion as to Count 5.

### 3.     18 U.S.C. §§ 1956(a)(1)(A)(i) and (2) – Promotion Money Laundering

To convict Patel of promotion money laundering, the government needed to show, beyond a reasonable doubt, "that the defendant: '(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity.'" *United States v. Prince*, 618 F.3d 551, 554 (6th Cir. 2010) (quoting *United States v. King*, 169 F.3d 1035, 1039 (6th Cir. 1999)) (quotation marks and additional citation in *King* omitted). Patel argues the government did not present sufficient evidence for the second and third of these elements. (*See* Doc. No. 206 at 4-5; Doc. No. 256 at 2-4).

As with Patel's concealment money laundering offense, there was sufficient evidence for a rational juror to find, beyond a reasonable doubt, that Patel knew the property he picked up and transported was the proceeds of unlawful activity. Patel's statements to Joyce about the deliveries "suggest[ed] he knew something illicit was going on," since his first instinct was to lie about what he was doing and why. *United States v. Tolliver*, 949 F.3d 244, 248 (6th Cir. 2020) (defendant's attempt to hide his identity when conducting transactions supported a finding he knew the money came from illegal activity). Patel's willingness to "coordinate his actions with others in the conspiracy" also supports the conclusion he knew the funds he transported came from unlawful sources. *Id.* at 249.

15

The evidence surrounding Patel's deliveries of the two cash pickups is sufficient to prove he promoted the conspiracy. A financial transaction that "reinvests the proceeds" into a money laundering conspiracy "promotes the conspiracy by allowing it to continue or grow." *Id.* at 248 (citing *United States v. Crosgrove*, 637 F.3d 646, 654 (6th Cir. 2011)) (emphasis in *Tolliver* removed). A rational juror could conclude Patel's first delivery to "David" promoted the conspiracy in this manner because it "complet[ed] the financial transaction" coordinated by "Owen," and that Patel's second delivery was designed to do the same, since it was destined for the same person. *United States v. Robinson*, 656 F. Appx. 145, 151 (6th Cir. 2016). A rational juror could further conclude Patel intended for both of his deliveries to promote the underlying money laundering conspiracy because he took a cut of the Robinson delivery and sought out additional pickup-and-delivery opportunities after his first one.

For these reasons, I conclude the government presented sufficient evidence to convict Patel of promotion money laundering under 18 U.S.C. §§ 1956(a)(1)(A)(i) and (2). I deny Patel's motion for a judgment of acquittal as to Count 9.

**B.     RULE 33 MOTION**

Patel makes the same arguments under Rule 33 as he does in the Rule 29 part of his motion. (*See* Doc. No. 206 at 6; Doc. No. 256 at 4). A Rule 33 motion requires me to view the evidence with somewhat less deference to the government, in order to "ensure there is not a miscarriage of justice." *Mallory*, 902 F.3d at 596. Nevertheless, I conclude Patel has not shown he is entitled to a new trial on any of the three offenses for which he was convicted.

As I discussed above, Patel's communications with "Aditya," "Owen," and "David," especially when combined with his incriminating statements to Joyce, show he knew of the conspiracy and joined it on purpose, even if he did not know every detail of it. Patel's first interactions with "Riyaz Bhai," in which he indicated the states to which he was willing to drive,

16

show he understood he was playing a part in a project with a number of moving pieces. Patel was instructed to be ready at a moment's notice to drive for hours across large swaths of the Midwest to pick up cash from people he did not know, in isolated locations. During his trips, he was monitored by a coordinator who doled out important information—like where he was to go and who he was to meet—piecemeal.

Patel was instructed on a particular method to verify his contact in Chicago, "David," that did not rely on ordinary details like the contact's full name or appearance. Patel was required to send videos of himself counting every single bill in the bags he picked up to ensure he did not siphon off unauthorized funds. He was instructed to take the funds he received to a second location, away from the pickup point, before counting it. And he received a "cut" of the proceeds, which he needed to pay various expenses. This secrecy, lack of trust, and stinginess with information are the hallmarks of a criminal conspiracy, not ordinary business activity.

Patel confirmed he understood this when questioned by Joyce. At first, he lied about where he picked up the money, who he got it from, and who he intended to meet in Chicago. Then, he admitted the truth—including that he had known about the pickups for a year, and that he initially thought the scheme involved drug money. He was not surprised to have been caught; he was surprised it took law enforcement so long to investigate.

Faced with Joyce's incriminating testimony, Patel challenges its credibility. (*See* Doc. No. 256 at 4). Under the Rule 33 standard, and unlike the more deferential Rule 29 framework, a district court must make such credibility determinations in its role as a "'thirteenth juror.'" *Matthews*, 31 F.4th at 448-49 (quoting *Mallory*, 902 F.3d at 596). Even so, I undertake this evaluation not to determine "whether the evidence was sufficient," but instead "whether the evidence weighed 'heavily' against the verdict." *Bowens*, 938 F.3d at 796 (citation omitted).

Patel notes that part of his conversation with Joyce was "not recorded" and asserts he "suffered from language-barrier issues" that may have inhibited his ability to say what he meant and to understand Joyce's questions.  (*Id.* at 4).  But no evidence presented at trial undermined Joyce's credibility in this respect or called into question Patel's ability to communicate during his conversations with Joyce.  On cross-examination, Joyce reiterated the same details about the recorded and unrecorded portions of his conversation with Patel as he did during his direct examination.  (*See* Doc. No. 251 at 12-27; 37-40).

And while the recorded portions of Patel's conversation with Joyce show Patel spoke with an accent, they also show Patel understood what Joyce was asking him and that his answers were responsive to Joyce's questions.  This supports the inference that Patel demonstrated a similar level of English proficiency during the unrecorded portions of the conversation, which took place moments later.  In short, the evidence presented at trial indicates the testimony about Patel's statements is reliable and is probative of his knowledge regarding the money laundering offenses for which he was charged.

Altogether, Patel knew he was joining a criminal conspiracy, and he intended at least one member of the conspiracy to engage in money laundering, when he twice picked up tens of thousands of dollars from people he did not know in isolated locations hours away from him, counted the money in secret, and delivered one batch of funds to an anonymous contact in Chicago, all the while being monitored by a mysterious contact named "Owen" who demanded constant updates and proof of compliance.  Patel's statements to Joyce confirm he understood he was participating in a criminal conspiracy.  Therefore, Patel's conviction for conspiracy to commit money laundering, in Count 1, was not a "miscarriage of justice" warranting a new trial.  *Mallory*, 902 F.3d at 596.

Similarly, the evidence presented at trial regarding the *mens rea* requirements for Patel's concealment money laundering and promotion money laundering offenses does not "weigh[] 'heavily' against the verdict." *Bowens*, 938 F.3d at 796 (quoting *Mallory*, 902 F.3d at 596) (additional citation in *Mallory* omitted).

As I explained above, Patel's statements to Joyce, combined with the nature of Patel's interactions with "Owen" and "David," shows he knew the funds he picked up came from unlawful sources.  The evidence further shows Patel knew that the transaction was designed to conceal the proceeds, the *mens rea* element specific to concealment money laundering.  For both the Robinson and the Evans transactions, Patel was instructed to drive a short distance away before counting the money, and he did so.  Patel also had the intent to promote the carrying on of wire fraud, the *mens rea* element for promotion money laundering.  He successfully delivered a box containing tens of thousands of dollars of ill-gotten gains to a person in Chicago who he identified by matching the serial number on a dollar bill, and he took a cut of the proceeds.  Moreover, after his first delivery, he sought out opportunities to do it again.

For these reasons, the evidence does not "weigh[] 'heavily' against the verdict[s]," and it would not be a miscarriage of justice to let the verdicts stand.  *Bowens*, 938 F.3d at 796 (citation omitted).  I deny Patel's motion for a new trial under Rule 33.

## V.  CONCLUSION

For the reasons above, I deny Patel's motion for a judgment of acquittal under Rule 29 and for a new trial under Rule 33.  (Doc. No. 206).

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge